The judgment of the court was pronounced by
Slidell, J.
The plaintiff claims from the defendant $20,000 damages for a breach of promise of marriage. The defendant admits that he corresponded with the plaintiff upon- the subject of marriage, but that he desisted, and had a right to desist from his addresses, before any reciprocal engagement was made, because he found her character to be such as to render her unfit to become his wife and the step-mother of his children; that by unchaste and unladylike conduct she had fallen into disrepute.
The jury found a verdict for $1000 in favor of the plaintiff. An unsuccessful motion was made for a new trial, and the defendant has appealed.
Our attention will first be directed to the question, whether such an action can be maintained under our laws and jurisprudence. In its consideration it is not improper to notice bi-iefly the history of the law on this subject.
The usage of sponsatia or promises of marriage among the Romans was of very ancient origin. It was observed among the people of Latium. It is spoken of in the Theodosian Code, in Justinian’s, in the decree of Gratian, &c. See Merlin Repertoire, verbo Fiangailles. Pothier’s Pandects, book 23, title 1. If the promise was not fulfilled, an action was permitted. Judex quam ob rem data acceptare non esset uxor qucerebat. Si nihil justa3 causte videbatur litem pecunia sestimabat; quanti que interfuerat earn uxorem accipi aut dari, eum qui spoponduat aut qui stipulatus erat condemnabat. Ib. art. 1, See also Mackeldy, Droit Romain, 263. In his Treatise on Marriage, Pothier says that the usage of Fiancailles existed among the Greeks, and, as it would seem, among the Ancient Hebrews. Under the Spanish law we find that the ecclesiastical tribunals would take cognisance of a breach of promise, and punish the party until he consented to fulfil the promise. Partida 4, tit. 1, law vii. Ca los que prometen que casaran uno con otro, tenudos son de lo cumplir ; fueras ende si alguno dellos pusiessó ante si escusacion alguna derecha, a tal que decriesse valer. E si tat escusa non ouiesse, puedenlo apremiar per sentencia, di Santa Eglesia, fasta que lo campla.
In France, a reciproca] promise of marriage is considered as producing a reciprocal obligation to contract a marriage. But if one of the two fiances refuses to accomplish the promise, neither the ecclesiastical nor lay tribunals can constrain a specific performance. The obligation resolves itself into damages, upon which a civil tribunal can alone decide. And these damages are assessed with *322 reference to the actual injury which the party has sustained, and not to the advantage which she has lost. Ces dommages et intéréts s’estiment en egard au prejudice reel que l’autre fiancé a pu sbuffrir, et non pas en agard & l’avantage quil put perdu. Merlin, verbo Fiancailles. See also Pothier Traite du Marriage, No. 53, &c. The former author observes, thatthe Civil Code, by its silence on the subject of Fiancailles, leave them in the general category of contracts, and that they are consequently submitted to the rules of ordinary agreements. Ib. § 11. In England, formerly, it would seem thatthe contract could be enforced in the spiritual court; and it is well settled under the common law, that an action will lie for the violation of such an executory contract per verbal de futuro, for the temporal loss to the party; and though the party had a remedy in the spiritual court. Under that system it appeal's that the man also has his action of damages for the breach of promise. Bacon’s Abridg, verbo Marriage, B.
The district judge was of opinion that a promise of marriage ought not to be placed beyond the pale of legal obligations. Although he could discover no warrant for the action in express legislation, he found it in the 21st article of the code, which declares that in civil matters Where there is no express law, the judge is bound to proceed, and decide according to equity, on the broad principle of justice embodied in the art. 2294, and in the example of other civilised nations. "We are not prepared to say that we should not have concurred with the decision of the district judge, even if there were no other reasons for maintaining it than those which he gave. But our legislation has not left this matter in doubt. The article 1928 C. C. speaks expressly of a promise of marriage. It is there treated as a contract, and a measure of damages for its breach is given.
We also concur with the district judge in the opinion that it is not necessary, for the validity of such a promise, that it should be in writing. The code prescribes that every matrimonial agreement must be made by an act before a notary and two witnesses, and that the practice of marriage agreement under private signature is abrogated. Art. 2308. We consider this as applying not to promises of marriage, but to what is called, in common parlance, a marriage contract: a contract by which the future husband and wife regulate their conjugal association in relation to property. This is obvious from the first article of the chapter in which the provision just cited is found. The promise of marriage is left, we conceive, as to the matter of form and proof, upon the footing of an ordinary agreement. Such was the case in the Roman law. Sufficit modus consensu ad constituenda sponsatia. Hinc in sponsalibus nihil interest atrum testatio interponatur, an aliquis sine scriptura spondeat. Pothier, Pandects, lib. xxiii, tit. 1, de Sponsalibus. Mackelday, Droit Remain, 302. In France, says Merlin, promises of marriage differ from marriage in this: that they may be made in the form common to all synallagmatic contracts; while the marriage can only be contracted in the presence of the proper public officers. Verbo Fiancailles, § vii. It seems that in some part of France there was formerly a statute requiring such promises to be in writing. We know of no provision of our law controlling the forms of such an agreement.
As regards the proof of the agreement, the jury was satisfied that it was made; and we think the evidence justified them in that conclusion. The repeated offers of marriage made by the defendant are conclusively shown by several letters addresed by him to the plaintiff. It is true, that an agreement to many, like any other, requires for its existence the mutual consent of the parties. There must be a promise by the one and an acceptance of that promise by the other. But it is not indispensable that the proof of acceptance should be direct. The jury had a right to infer the plaintiff’s acceptance from circum *323 stances, such as the conduct of the parties towards each other. See Daniel v. Bowles, 2 Carr & Payne, 553.
There is no doubt that if the defendant had proved the matters set up in his answer it would have legally excused his breach of promise. What was said by a great lawgiver of ancient times is equally true in our day. In the language of Solon, “marriage shoujd be regarded as an honorable fellowship and society in order to raise subjects to the State; to make the married pair live agreeably and harmoniously together, and to give continual testimony of mutual love and tenderness to each other.” Such results could not be expected from a marriage with a woman of unchaste character; and on no principle of public policy or justice, could a man be held to a promise made to such a person. We would even go further and say, that a man who had promised marriage, should be excused from his promise if he could show that the general reputation of the other party was bad, even without proving that such general reputation was well founded ; especially if he made the promise in ignorance of that reputation.
Butin the present case the defence is not made out to that extent. Although a few persons appear to have thought unfavorably of the plaintiff, there is a great deal of testimony the other way. There was also testimony going to weaken the effect of what was said by some of the defendant’s witnesses; and it is particularly to be observed that the defendant was aware of the disparaging rumors which had been circulated about the plaintiff, and declared them unfounded. In a letter pressing his suit, he expresses a fear that she might be influenced by • rumours circulated about himself, and urges her not to regard them. “ I hope you will not listen to such advisers; you know that you have been slandered, and it only served to strengthen my affection for you. You know how to sympathise with me.”
We consider the plaintiff’s character as distinctly put at issue before the jury, and great diligence appears to have been used by the defendant to collect evidence. The testimony in this cause is extremely voluminous; it has received our careful perusal; and we do not feel authorised, after considering it minutely, to disturb the verdict, which vindicates the plaintiff’s reputation.
It is proper to observe that there were numerous exceptions to the admission of evidence, and also to the charge of the judge. Some of the former were well taken ; and there are portions of the charge which are not .free from objection. But if we were to strike from the record all the evidence unduly received, there would be still enough to sustain the verdict; and we do not think there is any reasonable ground to suppose -that the cause, if remanded, would terminate more fiivorably to the defendant.
Under the evidence, we are not prepared to say that the amount allowed by the jury is excessive.
In conclusion, we may take occasion to observe, that this is the first time we or our predecessors have been called .upon to consider an action of this kind. It is a fact creditable to our people; and we hope that such actions may not become frequent. While we are bound, under our jurisprudence and code, to recognise the right of action, we are constrained to say that a female of refined sensibility could scarcely bring herself to such a suit; and that the appeals which are usually made to juries in such cases, on the score of the wounded affections of the woman, can have little foundation in truth. Such suits are notunfrequently the mere instruments of extortion; courts and juries should, therefore, cautiously restrict relief to cases of real injustice.
Judgment affirmed, with costs.